Approved: _____
SCOTT A. HARTMAN
Assistant United States Attorney

Before:  THE HONORABLE PAUL E. DAVISON
         United States Magistrate Judge
         Southern District of New York

ORIGINAL

------------------------------------- X
                                      :
UNITED STATES OF AMERICA              :   SEALED
                                      :   COMPLAINT
         -v.-                         :
                                      :   Violations of 18 U.S.C.
NICOLE NAUDY,                         :   §§ 2261A and 2
    a/k/a "Nicky," and                :
JOHN NAUDY,                           :   14m1716
    a/k/a "John Hill,"                :
    a/k/a "Jay,"                      :   COUNTY OF OFFENSE:
                                      :   ORANGE
         Defendants.                  :
                                      :
------------------------------------- X

SOUTHERN DISTRICT OF NEW YORK, ss.:

         JESSICA MILLER, being duly sworn, deposes and says that she is a Special Agent employed by the Federal Bureau of Investigation ("FBI"), and charges as follows:

                              COUNT ONE

         1.   From in or about February 2013, up to and including on or about August 1, 2014, in the Southern District of New York, NICOLE NAUDY, a/k/a "Nicky," and JOHN NAUDY, a/k/a "John Hill," a/k/a "Jay," the defendants with the intent to injure, harass, intimidate, and cause substantial emotional distress to another person, and with the intent to place another person in reasonable fear of the death of, and serious bodily injury to, that person, and a member of the immediate family of that person, did knowingly use a facility of interstate and foreign commerce to engage in a course of conduct that did cause substantial emotional distress to that person and did place that person in reasonable fear of the death of, and serious bodily injury to, that person and a member of the immediate family of that person, and did aid and abet the same, to wit NICOLE NAUDY, aided by JOHN NAUDY, made telephone calls to a particular

individual ("the Victim") in which he and his family were threatened threatened with death or serious bodily injury.

(Title 18, United States Code, Sections 2261A and 2.)

The bases for my knowledge and for the foregoing charge are, in part, as follows:

2. I have been personally involved in the investigation of this matter. This Affidavit is based upon my personal participation in the investigation, my examination of reports and records, and my conversations with other law enforcement agents and other individuals. Because this Affidavit is being submitted for the limited purpose of demonstrating probable cause, it does not include all the facts that I have learned during the course of my investigation. Where the contents of documents and the actions, statements, and conversations of others are reported herein, they are reported in substance and in part, except where otherwise indicated.

3. I have spoken with the Victim, from whom I have learned the following:

a. The Victim, who is 26 years old, has been partially deaf since birth and suffers from a developmental disability.

b. The Victim attended high school with NICOLE NAUDY, a/k/a "Nicky," the defendant, but was not close with her at the time. They became reacquainted in 2007, when NAUDY contacted the Victim through a social networking website and struck up a friendship with him.

c. During the summer of 2012, the Victim began to notice that after going out for drinks with NICOLE NAUDY and her husband, JOHN NAUDY, a/k/a "John Hill," a/k/a "Jay," the defendant, he would wake up the next morning with little memory of what happened the night before. The Victim experienced these blackouts after going out with NICOLE and JOHN NAUDY even when he had not been drinking to excess the night before. The Victim also noticed that after going out with NICOLE and JOHN NAUDY, he would frequently awake to find that money had been withdrawn from his bank account using an automated teller machine. The Victim often had no memory of making the withdrawals.

d. The Victim expressed concern to NICOLE and JOHN NAUDY about the blackouts that he had experienced. They offered to inject him with what they called a "Stimey" shot before going out to drink. They told the Victim that the

2

"Stimey" shot would allow him to drink more alcohol and reduce the chances of a blackout. The Victim agreed.

   e. From August 2012 to December 2012, NICOLE and JOHN NAUDY injected the Victim with "Stimey" shots on multiple occasions. They told the Victim that JOHN NAUDY obtained the drug in the injections from his employer, an ambulance service in Monticello, New York. The Victim stated that, far from reducing the frequency of blackouts, the "Stimey" shots he obtained from NICOLE and JOHN NAUDY seemed to make his blackouts more frequent and more severe.

   f. The Victim stated that, during this period, he would often drink large quantities of alcohol alone in his car. NICOLE and JOHN NAUDY would meet him to give him the "Stimey" shots, but they would not drink themselves. NICOLE NAUDY told the Victim that it was important for him to drink to excess because the Victim had a girlfriend, "Taylor," who only came around when the Victim was drunk. The Victim never met "Taylor" in person, but, using Facebook.com, he communicated with an individual who he believed to be "Taylor" and who was using a Facebook profile labeled "Tay Tay."

   g. In late 2012, NICOLE NAUDY told the victim that he needed to participate in a dance contest in order to impress "Taylor." As explained by NICOLE NAUDY, the contest required that the Victim dress as a woman and walk down the side of a road in Monticello, New York. NAUDY told the Victim that he needed to lie down in the middle of the road and pretend to be dead (the "dress incident"). The Victim did this, and a bystander called for medical assistance. The ambulance that responded was being staffed by JOHN NAUDY.

   h. The Victim described two other incidents related to the dance competition. On one occasion, NICOLE NAUDY told the victim that the competition required him to strap multiple zip ties around his penis. The Victim complied while NICOLE NAUDY watched. On another occasion, NAUDY told the victim that the competition required him to stick his penis in a bottle and strap the bottle to his body using tape. The Victim complied, but the bottle became stuck. He had to go to the Port Jervis Hospital to have it removed.

   i. Shortly after the dress incident, the Victim was contacted by NICOLE NAUDY. NICOLE NAUDY told the Victim that when the ambulance picked him up on the side of the road, the Victim had provided the ambulance operators with a false name and date of birth. NICOLE NAUDY told the Victim that

3

providing false information to a paramedic was a crime and that he could go to jail. But she told the Victim that the ambulance company would not report the violation to the authorities if the Victim agreed to pay the company money. The Victim agreed to make the payments but expressed concern about being able to get the money in time. NICOLE NAUDY offered to front him $2,000. The Victim agreed.

    j. In or about January 2013, NICOLE NAUDY told the Victim that his debt to the ambulance company totaled $390,000. She demanded that the Victim make an immediate payment of $6,000. The Victim agreed and made the payment to NICOLE NAUDY in cash that month. On one occasion, NAUDY showed the Victim a piece of graph paper sketching out his debt to the ambulance company and the possible ways that he could pay it back.

    k. In or about February 2013, the Victim began making payments to NICOLE NAUDY purportedly for repayment of the ambulance company debt. The Victim made the payments pursuant to a payment plan established by NICOLE NAUDY. The payments began at the rate of $200 per week but quickly increased. Most recently, the Victim has been required to pay $1,000 every two weeks and $500 on the off weeks. The Victim estimates that, during the life of the scheme, he has paid NICOLE NAUDY and/or JOHN NAUDY approximately $60,000.

    l. Generally, the Victim delivers the money each Friday in $20 denominations to a home in Monroe, New York, where the Victim knows JOHN and NICOLE NAUDY live. Generally, the Victim puts the money in an envelope and writes his name and the date of the payment on the front. He seals the envelope and signs his signature over the seal.

    m. The Victim recalled that, on at least one occasion, he delivered a payment to JOHN NAUDY, who met him at the Victim's place of employment. The Victim provided NAUDY with a sealed envelope, and NAUDY asked the Victim how much was inside. The Victim replied, "$700."

    n. NICOLE NAUDY has told the Victim that the ambulance company to whom the Victim owes the debt is owned by a dangerous mafia based in or around Albany, New York (the "ambulance company mafia"). NAUDY has told the Victim that each time he delivers a payment to her, she, in turn, drives to Albany to provide the money to the mafia that controls the ambulance company.

4

o. NICOLE NAUDY has told the Victim that the mafia intends to seriously injure or kill the Victim and the Victim's family if the Victim fails to make payments according to the payment plan.

p. For example, in early July 2014, NICOLE NAUDY told the Victim that the mafia was watching his house and that he should stay away from his home for a few days. NICOLE NAUDY told the victim that, if he went home, the mafia would kill the Victim, the Victim's mother with whom he lives, and the Victim's dog.

q. In late July 2014, NAUDY again told the Victim that the mafia was going to cut his mother to death with a chain saw and kill him if he did not continue to make payments to her on schedule and in the amounts required.

r. Also in early July 2014, NICOLE NAUDY told the Victim that the ambulance company mafia needed him to act as a diversion so that they could conduct a drug deal. NAUDY convinced the victim to allow her to scratch up his arms and withdraw his blood, which she then splattered all over the Victim's body and clothes. NAUDY then left the victim lying in the woods near Chester, New York and called for emergency assistance. The Victim was airlifted to Westchester Medical Center, where he received medical attention.

s. Later, NICOLE NAUDY told the Victim that, because the drug deal did not succeed, the ambulance company mafia was now attempting to kill the Victim and that he needed to run away from home for a few days, because the mafia was watching his home. NAUDY told the Victim that if he returned home, the mafia would kill him, his mother, and his dog.

t. According to the Victim, NICOLE NAUDY has used text messages, cellular telephone communications and Facebook.com, as well as in-person meetings to discuss the debt that the Victim must pay to the ambulance company mafia and to threaten him with death and serious injury to himself and his family if he did not comply.

4. On or about July 31, 2014, the Victim, acting at my direction, placed a telephone call to NICOLE NAUDY, a/k/a "Nicky," the defendant, on the cellular telephone number she had used in the past to communicate with him. During the call, which was recorded, the Victim told NAUDY that he would not be able to make the full $1,000 payment that she was expecting to receive on August 1, 2014. NAUDY became angry and told the

5

Victim, in substance and in part, "I'm going to tell them and they're not going to be happy at all. I hope they don't put a bullet in you-know-who's head. Come up with the money [Victim], try your hardest. Because it's not a game anymore."

5. Shortly after the conversation described in paragraph 7 above, NICOLE NAUDY, a/k/a "Nicky," the defendant, called the Victim in response to a text message that the Victim sent her. During the call, which was recorded, the Victim told NAUDY that he might be able to make a payment on August 1, 2014, but would not be able to do so until 5:00 p.m. NAUDY responded, "That's not possible." Later in the call, she said, "You're going to start understanding the hard way." When the Victim asked NAUDY what she meant by that comment, NAUDY replied, "You know what I mean." When the Victim told NAUDY that he would have the money in the afternoon, she replied, "Okay, well you're not going to be alive in the afternoon. That's the end of it. I'm done talking to you." After the Victim continued to insist that he could not get the money until 5:00 p.m., NAUDY said, in substance and in part, "The consequences are going to come down on you. I'm not going to keep putting my life in danger because of you. You don't understand, do you? Are you that stupid? Seriously? . . . I shouldn't have to be risking me and my son's life for you."

6. On or about August 1, 2014, after failing to make a payment on time, the Victim received a call from JOHN NAUDY, a/k/a "John Hill," a/k/a "Jay," the defendant. During the call, JOHN NAUDY expressed frustration that he had been unable to make contact with the Victim earlier in the day and demanded that the Victim call NICOLE NAUDY, a/k/a "Nicky," the defendant, immediately. The call was recorded. The Victim then called NICOLE NAUDY and made arrangements to meet her later in the day to make a payment of $800. The meeting was to take place outside of a Dunkin' Donuts restaurant in Central Valley, New York.

7. Several hours after the conversation described in the preceding paragraph, also on or about August 1, 2014, the Victim met NICOLE NAUDY, a/k/a "Nicky," the defendant, outside of the Dunkin' Donuts. During the meeting, which was recorded using audio-visual surveillance equipment, JOHN NAUDY, a/k/a "John Hill," a/k/a "Jay," the defendant, drove to the meeting location with NICOLE NAUDY, and after NICOLE NAUDY accepted the payment from the victim, JOHN NAUDY followed the Victim into the Dunkin' Donuts.

8. I have reviewed medical records from the Bon Secours Community Hospital in Port Jervis, New York. These records indicate that on or about January 13, 2014, the Victim reported to the hospital with his head partly shaved, wearing a sports bra, a short skirt, and duct tape wrapped around both legs. The Victim told hospital personnel that he was at a party and friends put his penis in bottle and that he called 911 to assists with removal of the bottle.

9. I have also reviewed medical records from the Westchester Medical Center. These records indicate that, on or about July 10, 2014, the Victim was transported to the hospital by helicopter after being found unconscious on the side of the road in Montgomery, New York. The hospital records indicate that upon examining him, hospital personnel found "no active bleeding" and "abrasions to the r[ight] arm." The Victim told hospital personnel that he had fallen from a rock while hiking.

WHEREFORE, the deponent respectfully requests that warrants issue for the arrest of NICOLE NAUDY, a/k/a "Nicky," and JOHN NAUDY, a/k/a "John Hill," a/k/a "Jay," the defendants, and that they be imprisoned, or bailed, as the case may be.

---

JESSICA MILLER
Special Agent
Federal Bureau of Investigation

Sworn to before me this
5th day of August 2014

---

THE HONORABLE PAUL E. DAVISON
United States Magistrate Judge
Southern District of New York